1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No. 1:17-cr-00231-DAD-BAM

12                  Plaintiff,

13         v.                               ORDER GRANTING DEFENDANTS'
                                            MOTION TO SUPPRESS
14   JORGE PAUL VERDUZCO-VERDUZCO,
                                            (Doc. No. 17)
15                  Defendant.

16

17         This matter is before the court on defendant Jorge Paul Verduzco-Verduzco's motion to

18   suppress all evidence seized pursuant to a traffic stop and subsequent search of his vehicle.  (Doc.

19   No. 17.)  Defendant Carlos Alfredo Soto-Soto joined in that motion.  (Doc. No. 18.)  The

20   government opposed the motion.  (Doc. No. 20.)  Defendant Verduzco-Verduzco filed a reply, in

21   which defendant Soto-Soto joined.  (Doc. Nos. 21, 22.)  In that reply, defense counsel withdrew

22   their initial request for an evidentiary hearing and requested that the court decide the motion on

23   the parties' briefs and exhibits.  (Doc. No. 21 at 1–2.)

24         On March 5, 2018, the court held a hearing on defendants' motion to suppress evidence, at

25   which Assistant U.S. Attorney Vincenza Rabenn appeared on behalf of the government and

26   Assistant Federal Defender Erin Snider and attorney John Garland appeared on behalf of the

27   defendants.  (Doc. No. 23.)   At the March 5, 2018 hearing, the Assistant U.S. Attorney stated that

28   the government did not seek an evidentiary hearing so long as the court found that probable cause

                                              1

1 existed for Officer Butler's stopping of the vehicle and citing the driver for violation of California

2 Vehicle Code § 12500(a). (*See* Doc. No. 25 at 26:19–27:11.) The court heard oral argument and

3 took the motion under submission.

4 On August 8, 2018, however, the court placed defendants' motion to suppress on its

5 August 13, 2018 calendar for further hearing. (Doc. No. 28.) At the August 13, 2018 hearing, the

6 court informed the parties that after fully considering the parties' briefing on the various issues

7 raised by the motion, it was now focused on the defendants' challenge to the inventory search of

8 the vehicle in question. (Doc. No. 29.) Specifically, the court advised it was focused on the state

9 of the record with respect to that issue, and inquired of the parties whether they sought an

10 evidentiary hearing limited to that issue. Pursuant to the government's request in response to the

11 court's inquiry, and over defense objections, the court set an evidentiary hearing. (*Id.*) The court

12 held that evidentiary hearing on August 24, 2018, at which Assistant U.S. Attorney Vincenza

13 Rabenn appeared on behalf of the government and Assistant Federal Defender Erin Snider and

14 attorney John Garland appeared on behalf of the defendants, and at which California Highway

15 Patrol ("CHP") Officers Matthew Butler and Shandara Kensey testified. For the reasons

16 explained below, defendants' motion to suppress will be granted.

17 **BACKGROUND**

18 In support of their motion to suppress defendants submitted the declaration of Delia

19 Rivera-Stark, a Spanish language interpreter with the Office of the Federal Defender, as well as

20 four exhibits: two compact discs with a recording of the traffic stop as captured by the mobile

21 video and audio recording system ("MVARS") (Exs. A-1, A-2); the report of California Highway

22 Patrol ("CHP") Officer Matthew K. Butler (Ex. B); the incident detail report (Ex. C); and the

23 consent-to-search form signed by Verduzco-Verduzco (Ex. D). (Doc. Nos. 17-2.) In support of

24 its original opposition to the pending motion, the government submitted one exhibit, the vehicle

25 registration card in Verduzco-Verduzco's name. (Doc. No. 20, Ex. A.) In addition, at the August

26 24, 2018 evidentiary hearing, the government called Officers Butler and Kensey to testify and

27 offered three additional exhibits into evidence: Officer Butler's curriculum vitae (Ex. 1); HPM

28 81.2, the CHP's policy regarding vehicle inventories (Ex. 2); and the CHP 180 form filled out by

2

Officer Butler in connection with the traffic stop at issue (Ex. 3).  Collectively, the undisputed facts, the testimony of Officers Butler and Kensey at the evidentiary hearing, and the declarations and exhibits submitted by the parties on the pending motion reflect the following.

On September 21, 2017, CHP Officer Butler was on patrol duty travelling on Interstate Highway 5 in Fresno County when he observed a black Mini Cooper with darkly tinted front side windows, in violation of California Vehicle Code § 26708(A)(1).  (Doc. No. 17-2, Ex. B at 1.) Officer Butler initiated a traffic stop and later wrote in his incident report that, as he approached the stopped vehicle, he immediately noticed the "overwhelming and pungent" odor of air freshener.  (*Id.*)  Officer Butler requested a driver's license from the driver, defendant Soto-Soto, who produced a Baja California driver's license.  (*Id.*)

Officer Butler then asked defendant Soto-Soto to step out of the vehicle and Soto-Soto complied.  (*Id.*)  Officer Butler asked the driver if he owned the vehicle, to which Soto-Soto replied that the car belonged to the passenger, defendant Verduzco-Verduzco.  (*Id.*)  In Spanish, Officer Butler asked Soto-Soto where he lived, and Soto-Soto stated that he lived in Los Angeles. (*Id.*; Doc. No. 17-2, Ex. A-1 at 03:30–03:36.)  When asked for his address in Los Angeles, Soto-Soto replied that he could not remember it.  (Doc. No. 17-2 at 6.)  Officer Butler then inquired where Soto-Soto was going, and Soto-Soto stated that he was traveling to Stockton to work in the fields, and did not know how long he would remain there.  (*Id.*)

Officer Butler then approached the passenger-side door of the vehicle and initiated a conversation with defendant Verduzco-Verduzco, primarily in Spanish, although Officer Butler was not fluent in the language.  (*Id.* at 8, 11.)  Verduzco-Verduzco confirmed that the vehicle belonged to him.  (*Id.*)  Officer Butler asked where he was going, to which Verduzco-Verduzco responded that they were going to Stockton, mentioning that there was a friend located there. (*Id.*)

Officer Butler then contacted CHP dispatch and requested that the vehicle and of Soto-Soto's and Verduzco-Verduzco's names be run through law enforcement databases, as well as the El Paso Intelligence Center ("EPIC"), an information clearinghouse for drug-related investigations.  (*Id.*; Doc. No. 17-2 at 15–16.)

3

While waiting for CHP dispatch to respond, Officer Butler asked defendant Soto-Soto why he did not have a California driver's license.  (Doc. No. 17-2 at 7.)  Soto-Soto responded that he had not gotten one, but that he had been told he could get one at the DMV.  (Doc. No. 17-2, Ex. A-1 at 07:30–07:45.)

CHP dispatch thereafter confirmed that neither Soto-Soto nor Verduzco-Verduzco had a California driver's license or a record with the DMV.  (Doc. No. 17-2 at 7.)  The record also appears to reflect that the EPIC check on both defendants came back "clear."  (Doc. No. 17-2, Ex. C.)  Officer Butler then wrote two tickets, one to Soto-Soto for driving without a driver's license in violation of California Vehicle Code § 12500(a), and one to Verduzco-Verduzco for having tinted windows in violation of California Vehicle Code § 26708.  (*Id.*)  Having confirmed that neither Soto-Soto nor Verduzco-Verduzco had a valid license to legally drive the vehicle away from the scene, Officer Butler requested a tow truck to impound the vehicle.  (*Id.*)

CHP Officer Shandara T. Kensey then arrived on the scene.  (*Id.*)  Officer Butler retrieved his narcotics dog from his patrol vehicle and walked the dog around the Mini Cooper twice.  (*Id.*)  The dog did not alert to the odor of narcotics.  (*Id.*)  After returning the dog to his patrol vehicle, Officer Butler commenced an inventory search of the vehicle.  (*Id.* at 3.)  During this search, Officer Butler opened the trunk and went through bags found therein, and examined the passenger compartments of the vehicle.  (*Id.*)  As a result of this search, Officer Butler observed five cell phones as well as "tooling marks" on the floor of the vehicle indicating to him that parts had been repeatedly removed and reinstalled.  (*Id.*)  Officer Butler also noted that there were numerous air fresheners inside the vehicle, and very few personal effects aside from the travel bags in the trunk.  (*Id.*)  Officer Butler did not complete a CHP 180, the form for documenting the property found as a result of an inventory search, at that time.

Following the inventory search, Officer Butler again questioned defendant Verduzco-Verduzco, this time about whether there were drugs, weapons, or money in the vehicle, which Verduzco-Verduzco denied.  (*Id.*)  Officer Butler asked if he could search the vehicle for drugs, and Verduzco-Verduzco consented.  (*Id.*)  Officer Butler then filled out the Spanish-language version of the California Highway Patrol's consent-to-search form.  (*Id.*)  Verduzco-Verduzco

4

signed the consent form. (*Id.*; Doc. No. 17-2 at 19–21.)

Another CHP officer, Angel A. Casas, then arrived on the scene and stood with Soto-Soto and Verduzco-Verduzco as Officers Butler and Kensey searched the vehicle. (Doc. No. 17-2 at 8–9.) During this post-consent search, the officers removed the driver's seat, removed "plastic snap in [sic] trim pieces which provide a transition between the vehicles [sic] carpet and the door seals and painted portion of the vehicle," removed the "speaker grille," and removed the speaker from the vehicle's interior. (*Id.* at 9.)

After searching the vehicle for approximately forty minutes, Officer Butler discovered six bundles of suspected heroin and four bricks of suspected cocaine in a hidden compartment. (*Id.* at 10.) Defendants Soto-Soto and Verduzco-Verduzco were thereafter arrested at approximately 4:50 pm on September 21, 2017. (*Id.*; Doc. No. 17-2, Ex. C.) At approximately 7:30 pm that evening, Officer Butler completed a CHP 180 documenting the inventory search. (Ex. 3 at 1.)

## LEGAL STANDARD

The Fourth Amendment states, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Traffic stops, "even if only for a brief period and for a limited purpose," are "seizures" within the meaning of the Fourth Amendment, and therefore are "subject to the constitutional imperative that [they] not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S. 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) ("The Fourth Amendment's prohibition against unreasonable searches and seizures applies to investigatory traffic stops.") "A police-initiated traffic stop is reasonable under the Fourth Amendment if the police stop the vehicle because of a 'reasonable suspicion' that the vehicle's occupants have broken a law." *United States v. Hartz*, 458 F.3d 1011, 1017 (9th Cir. 2006); *see also United States v. Hensley,* 469 U.S. 221, 226 (1985) ("[L]aw enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity."); *United States v. Lopez-Soto*, 543 F.3d 1080, 1087–1088 (9th Cir. 2008); *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000). An officer making a traffic stop "must have a particularized and

objective basis for suspecting the particular person stopped of criminal activity," in light of the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also Navarette v. California*, __U.S.__, __, 134 S. Ct. 1683, 1687 (2014); *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). The reasonable suspicion standard is intentionally abstract, and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *Arvizu*, 534 U.S. at 273–77; *see also* United States v. Edwards, 761 F.3d 977, 983 (9th Cir. 2014) ("Reasonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability,' and '[t]he standard takes into account the totality of the circumstances—the whole picture.'") (quoting *Navarette*, 134 S. Ct. at 1687); *Hartz*, 458 F.3d at 1017 ("Reasonable suspicion exists if 'specific, articulable facts . . . together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity.") (quoting *Lopez–Soto*, 205 F.3d at 1105).

## ANALYSIS

Defendants Verduzco-Verduzco and Soto-Soto argue that under the undisputed facts, law enforcement violated their Fourth Amendment rights to be free from unreasonable seizures and unreasonable searches. (Doc. No. 17 at 10.)

### A. Unreasonable Seizure

Defendants first contend that they were subjected to an unlawful seizure because the officers unreasonably prolonged the vehicle stop: first, by preparing a citation to defendant Soto-Soto for driving unlicensed, calling for a tow truck, and then conducting an inventory search despite insufficient information to determine whether Soto-Soto was properly licensed to drive in California; second, by requesting an EPIC records check following the vehicle stop; and third, by continuing to detain the defendants even after having issued defendant Verduzco-Verduzco a traffic citation for having a vehicle with tinted windows. (*Id.* at 12.)

As the Supreme Court has explained, the acceptable duration of a police detention in the context of a traffic stop is determined by the seizure's "mission," i.e. the reason the traffic stop was permissible under the Constitution in the first place. *Rodriguez v. United States*, __ U.S. __, __, 135 S. Ct. 1609, 1614 (2015). If the reason for a stop is to address a traffic infraction, the stop

6

may "last no longer than is necessary to effectuate th[at] purpose." *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1985)). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). An officer may, however, extend a traffic stop if the extension itself is independently supported by reasonable suspicion. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015) (citing *United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007)). The extension of a traffic stop requires the officer to be "aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Id.* (quoting *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc)).

1.  The Officer Did Not Unreasonably Prolong the Stop by Preparing a Citation for Driving Unlicensed, Calling for a Tow Truck, and Conducting an Inventory Search

California law provides that a person may not operate a motor vehicle without a valid California driver's license unless a statutory exception applies. Cal. Veh. Code § 12500(a). Section 12502(a) provides such an exception for non-residents over the age of eighteen years who have "a valid driver's license issued by a foreign jurisdiction of which he or she is a resident." Residency, in turn, is determined by the individuals' state of domicile, that is, the state in which the individual "has his or her true, fixed, and permanent home and principal residence and to which he or she has manifested the intention of returning whenever he or she is absent." Cal. Veh. Code § 12505(a)(1). If an individual entitled to an exemption from the California driver's license requirement under § 12502(a) later establishes residency in the state of California, he or she must obtain a California driver's license within ten days of establishing residency, and during those ten days, may not operate a motor vehicle for employment. Cal. Veh. Code § 12505(c).

In their moving papers defendants argue that CHP Officer Butler failed to conduct the necessary investigation to determine defendant Soto-Soto's residency and thus whether he was exempt from the requirement of possessing a California driver's license. (Doc. No. 17 at 13.) In this regard, defendants contend that Officer Butler "knew only that Mr. Soto-Soto 'lived' in Los Angeles." (*Id.* at 14.) Defendants assert that Officer Butler failed to ask, for example, how long

7

Soto-Soto had lived in Los Angeles, whether he intended to return to Baja California, where he was registered to vote, or where he paid taxes.[1] (*Id.* at 14.) Defendants also argue that, as a passenger in the vehicle, Verduzco-Verduzco's right to be free from unreasonable seizure was likewise violated as a result.[2]

The court finds defendants' argument on this point to be unpersuasive. Not only did defendant Soto-Soto state that he lived in Los Angeles, he also told Officer Butler that he was going to work in Stockton. When asked why he did not have a California driver's license, Soto-Soto acknowledged that he had been told he could get one, but had not done so. Moreover, defendant Verduzco-Verduzco, who owned the vehicle, provided Officer Butler with a vehicle registration in his name which indicated that the car was registered to a Los Angeles address in February 2017. (*See* Doc. No. 20 at Ex. A.) Given these facts, when considered together, it was reasonable for Officer Butler to believe that Soto-Soto was residing in California and therefore was not authorized to legally drive in California on his foreign driver's license. Officer Butler therefore did not unreasonably prolong the vehicle stop by writing Soto-Soto a citation for driving unlicensed, calling for a tow truck after determining that neither Soto-Soto nor Verduzco-Verduzco had a valid driver's license, and conducting an inventory search of the vehicle.

2. The Officer Also Did Not Unreasonably Prolong the Stop by Requesting an EPIC Records Check

The Supreme Court has recognized that as part of a traffic stop officers may engage in routine tasks, such as checking driver's licenses and determining whether the driver has any outstanding warrants, which "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 135 S. Ct. at

---

[1] Pursuant to § 12505(a)(1), prima facie evidence of residency for driver's licensing purposes includes, but is not limited to, the address at which the individual is registered to vote; the payment of resident tuition at a public institution of higher education; filing a homeowner's property tax exemption; and other acts, occurrences, or events that indicate presence in the state is more than temporary or transient.

[2] In support of this latter contention defendants cite to the decision in *Brendlin v. California*, in which the Supreme Court held that "a traffic stop subjects a passenger, as well as the driver, to Fourth Amendment seizure." 551 U.S. 249, 254 (2007).

1615. If, however, an officer conducts such checks or makes inquiries unrelated to traffic safety, and those checks or inquiries extend the length of a traffic stop, the officer must have reasonable suspicion of criminal activity to justify the further detention of the driver and any occupants of the vehicle. *Id.*; *see also Evans*, 786 F.3d at 785–86 ("Tasks not related to the traffic mission . . . are therefore unlawful if they add time to the stop, and are not otherwise supported by independent reasonable suspicion of wrongdoing.") (internal brackets and quotation marks omitted); *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017).

Defendants argue that Officer Butler unreasonably prolonged the traffic stop in this case by requesting an EPIC record check which, they allege, was unrelated to traffic safety or the objective of the traffic stop in question. (Doc. No. 17 at 15–16.) According to defendants, the mission of the stop should have been limited to determining the status of Soto-Soto's driver's license and that by requesting an EPIC check[3], Officer Butler exceed the scope of that mission. The court disagrees given the facts of this case.

As noted above, officers may conduct additional checks unrelated to the traffic mission if such checks are supported by independent reasonable suspicion of wrongdoing. *See Evans*, 786 F.3d at 785–86. The Supreme Court has defined reasonable suspicion as "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417 (1981); *see also United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013). In determining whether reasonable suspicion exists, the underlying facts are considered in their totality and in light of the officer's experience. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) ("This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person."); *United States v. Valdes–Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc) ("Although reasonable suspicion standard 'is not a particularly high threshold to reach . . . 'a mere hunch is insufficient. . . .'"); *United States v.*

---

[3] EPIC has been described as "an information clearinghouse for drug-related investigations." *United States v. DeJesus*, No. 2:09-cr-22-WKW, 2009 WL 3488690, at *2 (M.D. Ala. Oct. 22, 2009).

*Franco-Munoz*, 952 F.2d 1055, 1058 (9th Cir. 1991).

Here, Officer Butler had a reasonable suspicion of drug trafficking, independent of the basis for the traffic stop, to justify his having an EPIC check run. In this regard, Officer Butler encountered an "overwhelming" odor of air fresheners as he approached the vehicle, and observed nervous behavior on the part of both Soto-Soto and Verduzco-Verduzco when he spoke to them, including trembling hands and noticeably pulsating carotid arteries. (Doc. No. 20 at 5.) Officer Butler also observed that defendants' nervous behavior did not dissipate even after he had issued them the traffic citations, suggesting to him that "their concerns were obviously much deeper than simply receiving a ticket." (Doc. No. 17-2, Ex. B at 6.) Moreover, as Officer Butler noted in his report, the two gave somewhat inconsistent accounts as to why they were traveling to Stockton, with Soto-Soto claiming that the purpose of the trip was to work in the fields, while Verduzco-Verduzco claimed that it was to visit a friend. (*Id.*)

The strong odor of air freshener in a vehicle may have an innocent explanation, and there is nothing inherently suspicious about the two individuals exhibiting nervousness under the circumstances, given that many citizens may become nervous in the context of a traffic stop even if they have nothing to hide or fear. Moreover, defendants' explanations of their travel plans were not necessarily mutually exclusive, and any apparent inconsistencies could possibly be attributed to the language barrier between Officer Butler and the defendants. Nonetheless, all of these circumstances and observations must be considered in combination. The Supreme Court has recognized that even a string of innocent behavior, when viewed together, may amount to reasonable suspicion of criminal activity on the part of a trained law enforcement officer. *See Arvizu*, 534 U.S. at 273–75 ("Although each of the series of acts was 'perhaps innocent in itself,' we held that, taken together, they 'warranted further investigation.'") (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)); *see also United States v. Sokolow*, 490 U.S. 1, 9 (1989) (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion). Here, the three observations noted above, together with Officer Butler's training and experience, provided him with reasonable suspicion of criminal activity afoot warranting further investigation. *See Illinois v. Wardlaw*, 528 U.S. 119, 124 (2000) (finding

nervous, evasive behavior to be a pertinent factor supporting reasonable suspicion); *United States v. Mason,* 628 F.3d 123, 128-29 (4th Cir. 2010) (officer reasonably suspected defendant was involved in drug trafficking after completing valid traffic stop based on defendant's extreme nervousness, extreme odor of air fresheners in vehicle, conflicting stories about purpose of trip from driver and passenger, and presence of vehicle on known drug trafficking route*); United States v. Shafer*, 608 F.3d 1056, 1063 (8th Cir. 2010) (finding defendants' "somewhat different accounts of their travels" to be a relevant factor supporting reasonable suspicion"); *United States v. Branch, 537* F.3d 328, 338 (4th Cir. 2008) (presence of several air fresheners known to be commonly used to mask the smell of narcotics found to contribute to reasonable suspicion); *United States v. Flores*, 359 F. Supp. 2d 871, 877 (D. Ariz. 2005) (finding the strong odor of air fresheners to be a particularized, objective factor supporting a reasonable suspicion).

Accordingly, the court finds that Officer Butler did not unreasonably prolong the vehicle stop by requesting that CHP dispatch run the EPIC check.

### 3. The Officer Also Did Not Unreasonably Prolong the Stop by Continuing to Detain Defendant Verduzco-Verduzco After Having Issued the Traffic Ticket

Defendants next argue that after having issued a ticket to defendant Verduzco-Verduzco for tinted vehicle windows, Officer Butler should have told him that he was free to leave. (Doc. No. 17 at 18.) As noted above, instead, Officer Butler initiated a different line of questioning, asking Verduzco-Verduzco whether there were drugs, weapons, and money in the vehicle. (*Id.*) Officer Butler also deployed his narcotics dog, who sniffed the exterior of the vehicle but did not alert to the presence of narcotics. (*Id.*) Officer Butler then conducted an inventory search, which defendants argue was an "obvious ruse to search for incriminating evidence." (*Id.*) Following the conducting of the inventory search, Officer Butler questioned Verduzco-Verduzco again regarding whether there was contraband in the vehicle, before requesting permission to search for drugs. (*Id.*)

As discussed immediately above, the court has concluded that Officer Butler had a reasonable suspicion that defendants were engaged in drug trafficking justifying further investigation. The deployment of the narcotics dog and the additional questioning of defendant

Verduzco-Verduzco about contraband in the vehicle after the officer formed a reasonable suspicion was therefore justified.  *See United States v. Pinex*, 720 Fed. App'x 345, 347 (9th Cir. 2017) ("Given the totality of the circumstances, the prolonged traffic stop was supported by reasonable suspicion that criminal activity was afoot .")[4]

### B.  The Search Was Nonetheless Unreasonable

Defendants next argue that, even if the court were to find that defendants were not unreasonably seized, the actual search of the vehicle was unreasonable for three reasons:  first, the inventory search was improper because there was no lawful basis for impounding the vehicle and the search was a mere ruse to look for incriminating evidence; second, defendant Verduzco-Verduzco did not freely, voluntarily, and intelligently consent to the search of the vehicle; and third, even if Verduzco-Verduzco's consent were valid, the officer's search exceeded the scope of his consent.  (Doc. No. 17 at 25–29.)

The Fourth Amendment guarantees the right of citizens to be free from unreasonable government searches.  U.S. Const. amend. IV.  The Supreme Court has observed that the touchstone of the Fourth Amendment is reasonableness, and that a judicial warrant is generally required to satisfy the Fourth Amendment's reasonableness requirement.  *Riley v. California*, __ U.S. __, __, 134 S. Ct. 2473, 2482 (2014).  Warrantless searches, on the other hand, "are *per se* unreasonable . . . subject to only a few specifically established and well-delineated exceptions."  *United States v. Cervantes*, 703 F.3d 1135, 1138–39 (9th Cir. 2012) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016).  Moreover, because warrantless searches are *per se* unreasonable, "the government bears the burden of showing that a warrantless search . . . falls within an exception to the Fourth Amendment's warrant requirement."  *Cervantes*, 703 F.3d at 1141 (citing *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001)); *see also Torres*, 828 F.3d at 1118.

/////

/////

---

[4]  Citation to this unpublished Ninth Circuit opinion is appropriate pursuant to Ninth Circuit Rule 36–3(b).

1          1. <u>The Inventory Search Did Not Comply with CHP Procedures</u>

2          In contending that the inventory search of the vehicle was improper, defendants reiterate

3    their argument that Officer Butler did not have sufficient information to determine that defendant

4    Soto-Soto was in violation of § 12500 of the California Vehicle Code.  For the reasons previously

5    articulated, the court finds that the issuance of the citation to defendant Soto-Soto for driving

6    without a valid California driver's license was appropriate, and that because neither Soto-Soto nor

7    Verduzco-Verduzco had a valid license to legally drive the vehicle away from the scene, the

8    vehicle was subject to impoundment pursuant to California Vehicle Code § 22651(p).

9          Defendants argue next, however, that even if the vehicle was lawfully subject to

10   impoundment, the inventory search conducted by Officer Butler here was nonetheless invalid

11   because it was not carried out in accordance with the CHP's standard procedures.  (Doc. No. 17 at

12   25–26.)

13         Once a vehicle is lawfully impounded, consistent with the Fourth Amendment, officers

14   may conduct an inventory search of the vehicle to protect an owner's property while it is in police

15   custody, to protect police against claims of lost or stolen property, and to protect police from

16   potential danger.  *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).  The Ninth Circuit has

17   recently addressed the question of when an officer's inspection of a vehicle following a stop

18   exceeds the constitutionally permissible bounds of an inventory search, and in doing so, stated as

19   follows:

20              As an exception to the warrant requirement of the Fourth
                Amendment to the United States Constitution, "police may, without
21              a warrant, impound and search a motor vehicle so long as they do
                so in conformance with the standardized procedures of the local
22              police department and in furtherance of a community caretaking
                purpose, such as promoting public safety or the efficient flow of
23              traffic."  *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir.
                2016).  *The purpose of such a search is to "produce an inventory"*
24              *of the items in the car*, in order "to protect an owner's property
                while it is in the custody of the police, to insure against claims of
25              lost, stolen, or vandalized property, and to guard the police from
                danger."  *Florida v. Wells*, 495 U.S. 1, 4, 110 S. Ct. 1632, 109
26              L.Ed.2d 1 (1990) (internal quotation marks omitted).  Thus, the
                purpose of the search must be non-investigative; it must be
27              "conducted on the basis of something other than suspicion of
                evidence of criminal activity."  *Torres*, 828 F.3d at 1118 (emphasis
28              added) (internal quotation marks omitted).  The search cannot be "a

                                             13

ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4, 110 S. Ct. 1632.

*United States v. Johnson*, 889 F.3d 1110, 1125 (9th Cir. 2018) (emphasis added); *see also United States v. Wanless*, 882 F.2d 1459, 1463 (9th Cir. 1989) (recognizing the same three reasons underlying a proper inventory search of an impounded vehicle).

To ensure that an inventory search is limited in scope to the extent necessary to carry out this caretaking function, warrantless inventory searches of vehicles are lawful "*only if* conducted pursuant to standard police procedures that are aimed at protecting the owner's property and at protecting the police from the owner charging them with having stolen, lost, or damaged his property." *United States v. Caseres*, 533 F.3d 1064, 1074–75 (9th Cir. 2008) (emphasis added) (holding that an inventory search was unconstitutional because the government presented no evidence that the impoundment served any caretaking function); *see also Florida v. Wells*, 495 U.S. 1, 6 (1990) (Brennan, J., concurring) (concurring in the judgment to affirm granting of motion to suppress because "the State did not offer any evidence at the suppression hearing to support a finding that Trooper Adams performed the inventory search according to 'standard operating procedures'"); *United States v. Taylor*, 636 F.3d 461, 464 (8th Cir. 2011) ("The reasonableness requirement is met when an inventory search is conducted according to standardized police procedures, which generally remove the inference that the police have used inventory searches as 'a purposeful and general means of discovering evidence of a crime.") (internal quotation marks omitted); *Cervantes*, 703 F.3d at 1141 ("In *Caseres*, we found the inventory search to be unconstitutional—even though the driver was driving on a suspended license—because the government presented no evidence that the impoundment served any caretaking function."); *Wanless*, 882 F.2d at 1463–64 (holding that inventory search was illegal because Washington State law prohibited troopers from conducting an inventory search without first asking the owner's consent, and the government failed to present evidence that the required procedure was followed). Moreover, and as acknowledged by the Ninth Circuit in *Johnson*, "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Cervantes*, 703 F.3d at 1141 (quoting *Wells*, 495 U.S. at 4); *see also Bayot v. Baca*,

3:14-cv-0206-RCJ-WGC, 2016 WL 8731435, at *3 (D. Nev. Mar. 4, 2016) ("The policy or practice of a law enforcement agency governing inventory should be designed to produce an inventory; the individual police officer must not be allowed so much discretion that an inventory search becomes a 'purposeful and general means of discovering evidence of a crime.'") (quoting *Wells*, 495 U.S. at 4).

At the August 24, 2018 evidentiary hearing in this case, the government produced HPM 81.2, the portion of the CHP manual governing vehicle inventories. (Ex. 2.) Among other provisions, that policy provides that "Departmental employees shall inventory the contents of all vehicles removed, impounded, or stored even if nothing of value is found," and that "[t]he inventory shall list all property contained in legally accessible areas of the vehicle's passenger compartment, glove compartment, console, trunk, and any other compartment or box which may contain property. . . . All property located should be opened and inventoried in the Remarks section of the CHP 180." (*Id.*)

In addition, Officers Butler and Kensey both testified at the evidentiary hearing that the purpose of an inventory search and the resulting written inventory set forth on the CHP 180 form is to protect the officers, CHP, the State of California, and the towing company from claims of damage to the vehicle or lost or stolen property. Indeed, the CHP policy itself states that "[a] vehicle inventory is intended to protect an owner's property and the Department against claims of lost, stolen, or vandalized property." (*Id.*) In accordance with that objective, Officer Butler testified that, when a vehicle is subject to impoundment, the normal, standard CHP practice is to conduct an inventory search prior to the arrival of the tow truck. Both Officers Butler and Kensey testified that the standard procedure it to have the tow truck driver sign the CHP 180 and for the officer to give the driver a copy of the form before the vehicle is towed away.

Here, notably, once Officer Butler had determined that defendants' vehicle was subject to impoundment and he had called for a tow truck, he did not first conduct an inventory search. Rather, Officer Butler deployed his drug sniffing dog to conduct an exterior sniff of the vehicle. (Doc. No. 17-2, Ex. B at 2–3.) Only after the dog completed its search and did not alert to the odor of narcotics did Officer Butler proceed to conduct an inventory search. (*Id.*) At the

15

evidentiary hearing, Officer Butler testified that he does not begin every inventory search by deploying his drug sniffing dog, but that here, he suspected that criminal activity was afoot.

Officer Butler's testimony in this regard suggests that he began the inventory search with an investigatory motive, even if he was otherwise lawfully permitted to conduct the inventory search. Of course, an officer need not turn a blind eye to evidence of a crime observed during the course of an inventory search; indeed, "[a]nything observed in the vehicle during the inventory search is admissible against the defendant." *Caseres*, 533 F.3d at 1074; *see also United States v. Solis*, No. CR 13-3895 MCA, 2015 WL 13651018, at *14 (D.N.M. Mar. 20, 2015), *report and recommendation adopted*, No. CR 13-3895 MCA, 2015 WL 13651019 (D.N.M. Dec. 23, 2015) ("[A]n inventory search is not rendered unconstitutional simply because it also had an investigatory purpose, provided that it is not the sole purpose"). Nonetheless, the court has not been made aware of any authority for the proposition that the proper objectives and required procedures for a lawful inventory search may be dispensed simply because the nature of the investigation subsequently changes.[5]

Here, it appears that once Officer Butler observed the five cellular phones and tooling marks in the vehicle during his inventory search, he abandoned the objectives of that inventory search and chose not to complete the CHP 180 at the scene in keeping with standard CHP procedures and practices. In fact, Officer Butler did not complete the CHP 180 until 7:30 pm— hours after defendants had been arrested and after the vehicle had been towed—and therefore did not obtain the signature of the tow truck driver on the CHP 180. (Ex. 3.) It appears Officer Butler therefore was required to recall the contents and the state of the vehicle he originally observed from memory in completing the CHP 180 well after the fact. It is therefore unsurprising that the CHP 180 provides scant detail, indicating that it was unknown whether the vehicle

---

[5] Put another way, although having a dual purpose in carrying out an inventory search does not *alone* render the search unlawful, it does make it all the more important that officers executing such a search do so in full compliance with the policies and procedures governing such searches and that they are limited to their proper purpose. This is because it has long been recognized that the inventory search exception is particularly subject to abuse. If that is the reed upon which a search is based and the governing policies and procedures are breached in its execution, then the circumstances that lead to the dual purpose will render the search an unlawful "purposeful and general means of discovering evidence of a crime." *See Wells*, 495 U.S. at 4.

contained a spare tire, and listing the only property in the vehicle as "misc clothing items, papers, cables, no other items of value noted or claimed." (*Id.*) At the evidentiary hearing, Officer Butler testified that he could not recall what kind of clothing, how many papers, or what type of cables he observed in defendants' vehicle. Moreover, Officer Butler's report and testimony make clear that he also discovered five cellular phones (which he found to be significant at the time) and bags containing defendants' clothing during the course of his inventory search. Yet, none of these items of value were documented on the after-the-fact CHP 180.

The government contends that perfect compliance with the vehicle inventory policy is not necessary, and that these minor discrepancies in Officer Butler's CHP 180 do not amount to a Fourth Amendment violation. The court acknowledges that the observations set forth above regarding the deficiencies in the belatedly prepared inventory may seem technical. But it is also clear that careful compliance with standard police procedures is the only bulwark to cabin an officer's discretion and ensure that an inventory search does not become mere pretext for an exploratory search. *United States v. Gibson*, No. 2:16-cr-00333-JAD-VCF, 2017 WL 3438450, at *5 (D. Nev. Aug. 10, 2017) ("Inventory searches . . . must be performed in strict accord with the police department's constitutionally sufficient, standard procedures to ensure that the search is not just a 'ruse for a general rummaging to discover incriminating evidence.'") (citing *Wells*, 495 U.S. at 4); *United States v. Frank*, 864 F.2d 992, 1004 (3d Cir. 1988) (cited with approval in *United States v. Penn*, 233 F.3d 1111, 1117 (9th Cir. 2000) ("[A]n inventory . . . necessarily implies a *detailed* account, catalog, or schedule.") (emphasis added). Even if the court were to consider merely substantial, and not strict, compliance with standard CHP procedures regarding inventory searches, Officer Butler's CHP 180 would not pass muster. Officer Butler acknowledged that he neglected to list the five cellular phones or bags he observed during the course of the inventory search. This is not simply a technical oversight. An "inventory" that fails, without any justification, to document items of value does not serve the purpose of an inventory, and may as well not be an inventory at all.

At bottom, it is the government's burden to "establish[ ] that a vehicle's impoundment and [inventory] search are justified under an exception to the warrant requirement." *United States v.*

*Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016); *see also Cervantes*, 703 F.3d at 1141 ("Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of showing that a warrantless search or seizure falls within an exception to the Fourth Amendment's warrant requirement.").  The court finds that this burden has not been met in this case.  Officer Butler's CHP 180 form did not document "all property" contained in the vehicle as required by HPM 81.2, was admittedly not completed in accordance with standard practice and procedure, and was completed in an untimely manner and without sufficient detail to satisfy the CHP policy's objectives to "protect an owner's property and the Department against claims of lost, stolen, or vandalized property."  (Ex. 2.)  The court therefore finds that Officer Butler's warrantless search of defendant Verduzco-Verduzco's vehicle was conducted in violation of the Fourth Amendment.  *See Caseres*, 533 F.3d at 1074–75; *Wanless*, 882 F.2d at 1463–64.

The evidence obtained as a result of the unlawful inventory search included Officer Butler's observation of five cellular phones in the vehicle, as well as "tooling marks."  (Doc. No. 20 at 8.)  This evidence must be suppressed.

### 2.  Verduzco-Verduzco's Consent to Search Was Tainted

The court next considers the effect of defendant Verduzco-Verduzco's consent to search of the vehicle.  Defendants contend that, even though Verduzco-Verduzco signed a consent-to-search form, his consent was not freely, voluntarily, or intelligently given.  (Doc. No. 17 at 21–23.)

The court need not address whether Verduzco-Verduzco's signing of the consent form was voluntary.  Even assuming that his consent was voluntarily given, "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent, unless subsequent events have purged the taint."  *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004) (internal citation omitted); *see also United States v. Furrow*, 229 F.3d 805, 813 (9th Cir. 2000) ("For purposes of the Fourth Amendment, a determination that a consent was voluntarily made 'only satisfies a threshold requirement.'  The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation."), *overruled on other grounds*, *United States v. Johnson*, 256 F.3d 895

(2001) (en banc). In determining whether the taint stemming from a Fourth Amendment violation has been sufficiently purged, courts consider the temporal proximity between illegality and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Washington*, 387 F.3d at 1073.

Again, it is the government's burden of establishing the admissibility of evidence obtained without a warrant. *See United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) (noting that in determining whether statements were the product of an illegal search, "[i]t is the government's burden to show that evidence is not 'fruit of the poisonous tree'"); *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980) (noting that determination of whether evidence was obtained by exploitation of an illegal act focuses on "the causal connection between the illegality and the evidence; and, the burden of showing admissibility rests on the prosecution"). Here, the government offered no evidence of a lapse of time or intervening events between the unlawful inventory search of the vehicle and defendant Verduzco-Verduzco's consent. On the contrary, the evidence before the court shows that Officer Butler sought Verduzco-Verduzco's consent immediately following his unlawful search of the vehicle.[6] (*See* Doc. No. 17-2, Ex. B at 3.) Moreover, the lack of evidence that the search was conducted in compliance with standard CHP procedures and the fact that no inventory was even generated strongly suggests that Officer Butler's purpose in conducting that search was to discover evidence incriminating the defendants. *See Brown*, 422 U.S. at 605 (purpose of the arrest was investigatory and constituted an "expedition for evidence in the hope that something might turn up"). Thus, in this case

---

[6] At the evidentiary hearing, Officer Butler was asked by government counsel whether CHP policy called for officers to seek consent to search even if they had probable cause and whether he intended to ask defendant Verduzco-Verduzco for consent to search regardless of the inventory search. The officer responded affirmatively. The first part of this question misses the mark. Officer Butler clearly did not have probable cause before his inventory search—he had a suspicion, but his considerable efforts at developing anything more than that through the DMV and EPIC checks and the dog sniff of the vehicle had not born fruit. The court pauses to comment that it generally found Officer Butler's testimony to be straightforward and credible. The lone exception was his answer to the second part of government counsel's question. The sequence of events here causes the court to conclude that until he performed his warrantless search of the vehicle and discovered the five cellular phones and observed the tooling marks on the floor beneath the front passenger seat, Officer Butler did not intend to ask for consent to search. If he had that intent, he would have sought consent before he ran the EPIC check and subjected the vehicle to a dog sniff.

consideration of all three relevant factors identified by the Supreme Court in *Brown* compel a finding that Verduzco-Verduzco's consent was tainted by the Fourth Amendment violation.

The government cannot rely on Verduzco-Verduzco's tainted consent to justify the warrantless search of the vehicle.[7]  Accordingly, all of the evidence seized during the search which followed Verduzco-Verduzco's consent—six bundles of suspected heroin and four bundles of suspected cocaine (Doc. No. 17-2, Ex. B at 8)—must be suppressed as well.

## CONCLUSION

For the reasons explained above, the court concludes that the inventory search of the vehicle was unlawful and defendant Verduzco-Verduzco's subsequent consent to search was tainted by that prior illegal search.[8]  Accordingly, defendants' motion to suppress (Doc. No. 17) is granted and all evidence obtained as a result of the unconstitutional inventory search of defendant Verduzco-Verduzco's vehicle is hereby suppressed.

As indicated at the hearing, this case is placed on the court's calendar on September 4, 2018 at 10:00 a.m. for a status conference.  The government shall be prepared to advise the court whether it intends to proceed with this prosecution in light of this order.  If the government

/////

/////

/////

------

[7]  According to the government, even if Verduzco-Verduzco's consent had not been obtained, Officer Butler was justified in conducting a further search of the vehicle because he had probable cause, and the warrantless search of the vehicle would have fallen within the automobile exception to the warrant requirement.  (Doc. No. 20 at 8.)  The only facts that the government contends supported a finding of probable cause, however, were the five cellular telephones and the "tooling marks" Officer Butler observed on the floor of the vehicle during the unlawful inventory search.  (*Id.*)  The court has already determined that this evidence must be suppressed as the product of the pretextual inventory search.  The government cannot rely on evidence obtained by an unlawful search to establish probable cause in attempting to fit within the automobile exception to the warrant requirement.  *See United States v. Karo*, 468 U.S. 705, 719 (1984) (where unlawfully obtained information was "critical to establishing probable cause" the exclusionary rule applies).

[8]  Given this conclusion, the court need not address defendants' additional argument that the extensive search of the vehicle, including the removal of much of its interior, exceeded the scope of Verduzco-Verduzco's consent.

indicates that it wishes to do so, the court will hear argument at that time on defendants' motion to dismiss which was filed August 16, 2018.

IT IS SO ORDERED.

Dated: __**August 24, 2018**__             _____
                                           UNITED STATES DISTRICT JUDGE